FILED

2009 Mar-09  AM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **BEVERLY A. WHITSON,** ) | |
| ) | |
| **Claimant,** ) | |
| ) | |
| **v.** ) | **CV-07-BE-0797-NE** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

The claimant, Beverly A. Whitson, filed applications for Disability Insurance benefits  and

Supplemental Security Income payments on July 7, 1999, alleging disability commencing on June

28, 1999 caused by a blood clot in her right lung, pneumonia, pleurisy, asthma, stress disorder,

coughing up blood, pulmonary embolus, deep vein thrombosis (DVT), obesity, and chronic

obstructive pulmonary disease (COPD). The Commissioner denied the claims. (R. 52).  The claimant

filed a timely request for a hearing before an Administrative Law Judge. (R. 82-83).  The ALJ held

a hearing on September 18, 2001.  (R. 451-470).  In a decision dated January 15, 2002, the ALJ

found that the claimant was not disabled within the meaning of the Social Security Act, and,

therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income

Payments. That decision was appealed on January 31, 2002 and remanded by the appeals council on

July 8, 2003. (R. 82-87).  A different ALJ held a second hearing on November 21, 2003. (R.  473-

503).  The ALJ reopened the record on February 10, 2004 to admit additional medical records and the opinion of a nonexamining doctor. (R. 413-425).   In a decision dated May 18, 2004, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income Payments. (R. 18, 34-35).

On June 23, 2004, the claimant requested a review of the ALJ's decision.  (R. 16-17). On September 24, 2004, claimant filed subsequent claims for a period of disability, disability insurance benefits, and supplemental security income, and the Commissioner found claimant to be disabled as of *June 3, 2004.*  On March 2, 2007, the Appeals Council denied the claimant's request for review of the May 18, 2004 decision addressing her claims for disability commencing on *June 28, 1999*. (R. 9-11).  The claimant has exhausted her administrative remedies, and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383 (c)(3). For the reasons stated below, the court will REVERSE and REMAND  the decision of the Commissioner.

## II. ISSUE PRESENTED[1]

Whether the ALJ properly specified the weight accorded to the opinions of claimant's physicians, explicitly explained the reasons for discounting the physicians' opinions, and established good cause for preferring a nonexamining physician's opinion over that of a treating physician.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  Under this limited

---

[1] Claimant raises other issues; however, because of the court's disposition of the issue listed, it need not address the rest.

standard of review, this court will not decide the facts anew, make credibility determinations, or re-weigh the evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). However, "[n]o presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*, but the Commissioner's factual findings must be supported by substantial evidence. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* In other words, substantial evidence is "more than a mere scintilla." *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998). The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. Furthermore, a reviewing court must not only look to those parts of the record that support the decision of the ALJ, but must also view the record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A)

(2000). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above question leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F. 2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520, 416.920 (2008).

The ALJ must accord "substantial" or "considerable" weight to the opinion of a claimant's treating physician, absent "good cause" to the contrary. *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir.1985).   The ALJ "must specify what weight is given to the treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).   When the ALJ ignores or fails to give explicit reasons for discounting a treating physician's opinion, he, in effect, accepts that opinion as true.  *Id*. An ALJ may discount even a treating physician's report when it is not accompanied by objective medical evidence. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The required "good cause" for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding.  *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).   Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence. *See Jones v. Dept. of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991);

4

*Edwards*, 937 F.2d at 584-85; *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987).  However, the report of a nonexamining physician, taken alone, cannot provide good cause if it is contrary to the treating physician's opinion; treating physician opinions are generally entitled to receive more weight than the findings of doctors who have not examined the claimant.  *Broughton*, 776 F.2d at 961.

## V. FACTS

The claimant was 37 at the time of the first administrative hearing and 39 years old at the time of the second. (R. 453, 476). She completed eleven grades of high school and received a G.E.D. (R. 480). The claimant also received some secretarial training in Julia Tutwiler Prison for Women. (R. 480). Her past work experience includes employment as a cook in a restaurant, a laundry worker in a hotel, a labor packer at a food assembly factory, a packer at a book assembly factory, a fire watcher, and a cook at a deli. (R. 485-87). According to the claimant, she became disabled on June 28, 1999, at age 36, caused by a "blood clot to right lung, pneumonia, pleurisy, asthma, stress disorder with coughing up blood, can't breathe, can't function for extended periods of time, no oxygen in blood." (Pl. Br. 1). The claimant has not engaged in substantial gainful activity since the alleged onset of disability. (R. 34).

During 1999, the claimant reported to the emergency room of local hospitals on a number of occasions, complaining of chest pain and shortness of breath. (R. 174).  In early July of 1999,  Dr. James Ashmore, a family practice doctor, and Dr. Carmichael, a pulmonologist, treated her upon her admission to Shoal Hospital, and diagnosed her as suffering from pulmonary embolism (blockage of pulmonary artery) with hemotysis (coughing up blood); acute bronchitis; early chronic obstructive pulmonary disease from smoking; obesity; and "maybe some early pneumonia." (R. 190).  On July 7, 1999, before she was discharged from the hospital, claimant applied for social security disability

insurance benefits and supplemental security income payments. (R. 52). Upon her discharge on July 11, 1999, Dr. Ashmore opined that the claimant would not be able to return to work at that time. (R. 190, 247).

On October 10, 1999, the claimant submitted to a "right lower extremity venous ultrasound," which revealed "no evidence of deep venous thrombosis (blood clot in a vein) within the right lower extremity." (R. 257). On the same day, the claimant also received a chest examination, which revealed a "normal chest." (R. 258). A ventilation-perfusion scan was completed on August 23, 1999, which suggested an improvement in lower lobe defects and revealed no evidence of acute pulmonary embolus (blood clot blocking the pulmonary artery). (R. 199).

In February of 2000, the claimant, while seeing Dr. L. R. Buckner, a vascular consultant, complained of a reddened and swollen right upper arm. (R. 238). Dr. Buckner completed a venous study of the claimant's right arm, which suggested a blood clot in the right basilica vein which was obstructing the vessel. (R. 238; 23). On July 25, 2000, Dr. D. Gandhi, an internist, performed a consultative physical examination on the claimant. (R. 262). The claimant complained of shortness of breath, coughing, and wheezing. (R. 262). However, the claimant was able to stoop over, squat, and walk on the heel and toes without difficulty. (R. 262). Furthermore, Dr. Gandhi reported that both knee joints, including flexion and extension movement, were normal. (R. 262). Dr. Gandhi did find "occasional crepitation (cracking sound)" present in both knee joints. (R. 263). Also, Dr. Gandhi performed a pulmonary function test which suggested a "severe degree of chronic obstructive pulmonary disease." (R. 263). However, he noted "mild to moderate improvement following the use of bronchodilator." (R. 264). He also made the following diagnoses: recurrent deep venous thrombosis (DVT - the presence of a clot in one of the deep veins) of the right leg, and obesity.

In the summer of 2000, claimant received two pulmonary function tests, including forced expiratory volume scores and forced vital capacity scores. These scores did not qualify under the listings as "severe," and indicated improvement in pulmonary function after the use of the bronchodilator.

Dr. Mark Williams, a psychologist, conducted a psychiatric review of claimant in November of 1999, finding no severe mental impairments, and although he found that she exhibited an anxiety related disorder, he found that this disorder resulted in only slight limitations in daily living activities; slight difficulties in social functioning; deficiencies in concentration, persistence, and pace occurring "seldom"; with no episodes of deterioration or decompensation. (R. 290).

The claimant received two Residual Functional Capacity assessments during 1999 and 2000. Although these assessments list the completing doctor as a "consultant," the record is unclear whether the doctors making the assessments examined claimant or simply reviewed her records. The first assessment, which Dr. William Lawrence completed on September 1, 1999, found that the claimant could: occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for about six-hours in an eight-hour workday; sit (with normal breaks) for a total of about six-hours in an eight-hour workday; and push and/or pull (including operation of hand and/or foot controls) with unlimited ability. (R. 293). He found that claimant should avoid concentrated exposure to cold, heat, wetness and avoid hazardous machinery and unprotected heights and only occasionally climb ladder, ropes, and scaffolds. (R. 296). In addressing Dr. Ashmore's finding that the claimant could not work, Dr. Lawrence determined that Dr. Ashmore's finding was based on temporary circumstances immediately after an acute illness and stated that "no objective findings [exist] to support permanent restrictions." (R. 298). The second RFC assessment, dated March 10, 2000 and performed by Dr.

William Kessler, reached the same conclusions except that the doctor would not restrict concentrated exposure to cold and wetness, but he would restrict all climbing involving ladder, ropes, and scaffolds, and restrict  the following postures to occasional use: climbing ramp/stairs, kneeling, crouching and crawling. (R. 302, 304).

On June 23, 2001, claimant arrived at Parkway Medical Center complaining of shortness of breath and chest pains, and on June 24, 2001, she was transferred to Shoals Hospital under Dr. Ashmore's care. (R. 353). The various tests were negative for new problems; Dr. Ashmore and the pulmonologist doubted that she had experienced a recurrence of her embolism.  In light of the negative test results, he brought in Dr. Shukla, a GI doctor to treat claimant for possible GI problems, such as reflux, ulcers or gallbladder disease.  Dr. Ashmore diagnosed the claimant, upon discharge from the hospital, with an old pulmonary emboli, chronic obstructive pulmonary disease, chest pains (cause unknown), tobacco abuse, hiatal hernia, and esophageal reflux. (R. 353).

First Hearing

At the hearing on September 18, 2001, the claimant testified that she was 5'5 ½" and weighed 289 pounds.  She had gained 75 pounds in the last six or seven months because of her inability to walk and exercise.  (R. 454).  She testified that, in addition to the clots in her right lung (1999) and right arm or hand (2000), she had suffered from two clots in the right upper lobe of her lung in June and a clot in her left  leg.  She claimed that she had been either been to the emergency room or admitted to the hospital 15 or 16 times in the past year, often for breathing problems when the inhaler did not work, and that she suffered from asthmatic attacks about once a week.  The ALJ remarked at the hearing that she was coughing and that she sounded like she was having difficulty getting enough breath to talk.  (R. 462-63).  When the ALJ asked her about daily activities, she

8

claimed to spend most of her day in the bed or a recliner with her feet elevated and stated that handling a pen and standing more than 10-15 minutes caused her pain. (R. 465-67).

The VE testified that claimant's past jobs as store clerk and poultry cutter and fire-watcher were classified as light, unskilled work; packer/assembler, grinding machine operator, and housekeeper were medium, unskilled; construction worker was heavy, semi-skilled; fast food worker was rated as light to medium, unskilled. Neither the ALJ nor claimant's attorney asked the VE any hypothetical questions.

After the hearing, the record was opened to add additional exhibits, including a report from Dr. Stonecypher about a pulmonary function test that claimant performed on November 14, 2001. (Ra. 370-380).

## First Decision

In a decision dated January 15, 2002, the ALJ denied the claimant's applications. (R. 58). In addressing the five-step sequential evaluation, the ALJ first found that the claimant had not engaged in substantial gainful activity since June 28, 1999. (R. 57). Second, the ALJ found all of the claimant's reported impairments "severe." (R. 57). Third, the ALJ concluded that none of the claimant's impairments met or equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. 57). Fourth, the ALJ found that the claimant was unable to perform any of her past relevant work. (R. 58). However, the ALJ then found that the claimant possessed the residual functional capacity to perform a limited range of sedentary work.

## Appeals Council

The claimant appealed the ALJ's findings. In 2003, the Appeals Council reversed the ALJ, listing several areas in which the ALJ erred in reaching his conclusions. First, the appeals council

stated that the ALJ's decision did not "contain a function-by-function assessment of the claimant's ability to do work-related physical and mental activities" nor did it contain "sufficient rationale with specific references to evidence of record in support of the assessed limitations." (R. 85). Second, the council found that the decision did not specify the degree of weight given to Dr. Ashmore's opinion. (R. 85). Furthermore, the council stated that the decision did not contain an evaluation of the state agency's assessments. (R. 85). Lastly, the council determined that a vocational expert's testimony was needed in the case. (R. 86).  The Council remanded the case for further proceedings consistent with its directions.

Further Treatment/Testing

Dr. Ashmore saw the claimant again in May of 2003. (R. 395).  During this visit, the claimant complained of acute chest pain. Upon examining the claimant, Dr. Ashmore diagnosed the claimant with anterior chest pain (non-cardiac), past history of deep vein thrombosis and pretibial edema, chronic obstructive pulmonary disease from smoking, gastrointestinal reflux, and acute gastritis. (R. 395). Also, Dr. Ashmore reported that, despite the claimant's history of deep vein thrombosis, she had quit taking the prescribed medicine, Coumadin. (R. 395). The claimant had also ceased taking her blood pressure medicine. (R 395). Dr. Ashmore stated that "[n]oncompliance is a big problem with [the claimant]." (R. 395).

Second Hearing

On November 21, 2003, a different ALJ held a second hearing.  Claimant testified that she was 5'5 ½ " and weighed 284 pounds and had decreased her smoking to three cigarettes a day.  She also testified that she could only stand 10-15 minutes before her feet would begin to throb, could sit 30 minutes before her feet start swelling and legs start hurting, could lift about ten pounds,  and that

10

she elevated her legs in a recliner higher than her chest.  (R. 492-5).  The claimant further testified that her breathing problems had worsened  since the last administrative hearing. (R. 492). Specifically, she stated that heat, fumes, and dust exacerbate her breathing problems, and as a result, she had to use her inhaler more than normal. (R. 492). The claimant also complained of anxiety, panic attacks, reflux disease, and hietal hernia. (R. 493-95).

The VE testified about the classification of claimant's past jobs.  She also testified that none of claimant's past jobs would allow for a sit-stand option.  Further, if claimant's testimony were credible regarding severe pain in her legs and back, the need to elevate her leg higher than her waist at least eight hours a day, and the existence of frequent panic attacks, the VE concluded that she could perform no work.  Assuming that claimant had no more than moderate pain;  had no more than a moderate limitation in mental functioning and social skills; could lift 10 pounds regularly and 20 pounds occasionally; required a workplace with no excessive heat, dust, or chemicals or fumes above household levels; and required a sit/stand option, the VE found that she could perform some light jobs at the unskilled level, and further found that such jobs were available in the national economy. (R. 500).  If lifting were reduced to a maximum of ten pounds, the VE testified that she could only perform sedentary jobs at the unskilled level. (R. 501).

Post-Hearing Records

After the second hearing, at the request of the claimant's attorney, Dr. Joe Cromeans, a family practice doctor, filled out a "clinical assessment of pain" form dated November of 2003 (R. 414), and a "physical capacities evaluation," dated December of 2003 because claimant's treating

11

physician, Dr. Islam, was out of town.  (R. 416).[2]  According to the clinical assessment of pain form, the physician opined that the claimant's "pain is present to such an extent as to be distracting to adequate performance of daily activities or work." (R. 414). Additionally, the form stated that the claimant would have "some increase" in pain due to walking, standing, bending, stooping, moving of extremities, etc., but not to such an extent as to prevent adequate functioning at such tasks. (R. 414). The form stated that side effects resulting from the claimant taking prescription drugs "can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." (R. 415).  The doctor opined that claimant had an underlying medical condition consistent with the pain and concluded that she was totally disabled.

Dr. Cromeans's physical capacities evaluation stated that the most reasonable lifting and/or carrying expectation for the claimant was 10 pounds occasionally. (R. 416). Furthermore, the form stated that the claimant could sit for 6 hours in a 8-hour workday, and stand for 4-hours in an 8-hour workday. (R. 416). Also, Dr. Cromeans was of the opinion that the claimant could occasionally use her legs and arms for pushing/pulling movements. (R. 416). Dr. Cromeans concluded that the claimant could climb stairs or ladders, bend, stoop, reach, and frequently use her hands for grasping, twisting, and handling. (R. 416).

Upon his return from vacation in December of 2003, Dr. Islam completed both a clinical assessment of pain and a physical capacities evaluation. Dr. Islam agreed with Dr. Cromeans's assessment that  the claimant could: occasionally lift 10 pounds and could frequently use her hands and fingers to grasp, twist, etc (R. 418).  However, in other respect the evaluation differed from Dr.

---

[2]Dr. Cromeans filled out the evaluations on behalf of Dr. Islam, the claimant's treating physician, who was Dr. Cromeans's partner and was on vacation at the time.

Cromeans: he found claimant could sit for 4 (but not 6) hours during an 8 hour workday; stand and/or walk for 2 (but not 6) hours of an 8 hour workday; never use her arms and/or legs for pushing and pulling; occasionally climb stairs and/or ladders; occasionally bend, stoop, or reach. (R. 418). Commenting generally on claimant's work-related functions, Dr. Islam stated: "Claimant has severe COPD/emphysema that primarily affects her ability to function effectively.  She's obese and lately her degenerative arthritis has been worsening further impairing her ability to work."  In addressing the effects of the claimant's pain, Dr. Islam opined that the claimant's pain "is present to such an extent as to be distracting to adequate performance of daily activities or work." (R. 419). Also, the doctor opined that the claimant walking, standing, bending, stooping, moving of extremities, etc., would increase the claimant's pain to such a degree as to cause distraction from tasks or total abandonment of tasks. (R. 419).  Finally, the doctor stated that some side effects from the claimant's prescription drugs may be present, but not to such a degree as to create serious problems in most instances. (R. 420).   Dr. Islam stated that claimant did have a medical condition consistent with the pain she experienced.  (R. 420).

After receiving these forms from the claimant, the ALJ requested that Dr. Hibbett, an internist, review claimant's medical records and Dr. Islam's medical source statement.  (R. 425). On January 10, 2004, the ALJ received a letter from Dr. Hibbett outlining the claimant's impairments and stating an opinion as to the claimant's physical limitations. (R. 423). Dr. Hibbett opined that the physical limitations that Dr. Islam assessed in his 2003 medical source statement were not consistent with the medical evidence of record. (R. 423). In reaching this conclusion, Dr. Hibbett considered the claimant's impairments, including pulmonary thromboembolism, chronic anticoagulation with coumadin as prophylaxis, hypertension, obesity, chronic obstructive lung disease secondary to

tobacco abuse (two packs per day), anxiety/depression with bipolar syndrome, and degenerative arthritis. (R. 423). Dr. Hibbett concluded that none of the claimant's impairments singly or collectively meet or equal any listing. (R. 424). He noted that although Dr. Islam mentioned degenerative arthritis, no joint x-rays were included in the medical records.

Dr. Hibbett next addressed the physical constraints resulting from the claimant's impairments. Dr. Hibbett stated: none of the impairments would require significant weight lifting constraints (the claimant could frequently lift 30 pounds); none of the impairments would significantly restrict the claimant's ability to push and pull; and none of the impairments would restrict the claimant from working 8 hours per day with alternate pulling, pushing or sitting. (R. 424). Dr. Hibbett did note, however, that, because of the claimant's obesity, she should not work at unprotected heights or climb ladders. (R. 424). Additionally, Dr. Hibbett stated that, because of the claimant's emphysema, she should avoid fumes, smoke and dust. (R. 424). Also, Dr. Hibbett found that mild ventricular hypertrophy was present, but in the absence of symptoms no work restrictions resulted. (R. 424). Lastly, Dr. Hibbett addressed the claimant's pain allegations. Dr. Hibbett pointed out that the claimant was taking no type of pain medication and that pain was never mentioned as an impairment. (R. 424).

Second Decision

In a decision dated May 18, 2004, the ALJ found that the medical evidence indicated that the claimant suffered from the following severe impairments: chronic obstructive pulmonary disease with a history of recurrent asthmatic bronchitis; recurrent deep venous thrombosis of the right leg; status post pulmonary emboli; obesity; a hiatal hernia; and esophageal reflux. (R. 23). The ALJ then addressed the steps of the sequential evaluation. First, the ALJ found the claimant

14

had not been employed since the alleged onset date. (R. 34). Second, the ALJ found that the claimant's impairments were "severe." (R. 34). However, addressing the third element, the ALJ found the claimant's impairments did not equal an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 34). As a result, the ALJ proceeded to the fourth element and made residual functional capacity determinations.

Applying the pain standard to claimant's subjective allegations, the ALJ found that claimant met part one of the pain standard but not part two.  With respect to the second prong of part two, the ALJ found that although claimant's conditions could reasonably be expected to produce the level of pain, difficulties in breathing and other symptoms that would preclude her working, those conditions do not meet the pain standards because they are "exacerbated by her ongoing chronic tobacco abuse [and] her noncompliance with her medication regimen.. . ." (R. 29).  However, within the same paragraph, the ALJ made the inconsistent statement that no objective evidence exists supporting a medical condition of such severity that it could reasonably be expected to give rise to the subjective symptoms.

The ALJ proceeded to examine claimant's various conditions –  breathing problems, vascular problems, incidences of blood clots, and edema – and determined that these problems were "well controlled" when claimant was compliant with medication and when she limited tobacco use, but that recurrences of problems occurred when claimant abused tobacco and failed to take prescribed medication, such as Lasix and Coumadin.  (R. 29-31).

The ALJ noted that claimant alleged arthritis and joint pain and that Dr. Islam's treatment notes indicated that she complained of pain.  However, the ALJ found that the record did not

otherwise support those complaints; claimant failed to seek help from an orthopedist, did not

present x-rays and other diagnostic imaging tests or lab analyses substantiating the presence of

arthritis or osteoarthritis, and claimant's tests showed a full range of motion in joints and

bones.(R. 30).

The ALJ did consider claimant's obesity, commenting that claimant did not comply with

instructions to lose weight.  He found that she did not have any significant functional restrictions

secondary to obesity, but in reaching that conclusion, he considered her obesity in connection

with arthritis and musculoskeletal disorders but not in connection with her breathing problems.

(R. 31).

After that discussion, the ALJ determined that claimant had the following RFC:  "with

moderate or less pain she can sustain an eight hour workday lifting ten pounds frequently and

twenty pounds occasionally.  The claimant requires the need to alternate sitting and standing at

the work site.  She is unable to tolerate excessive heat, dust, chemicals or fumes at the workplace

in excess of those found at normal household levels.  The claimant has no more than moderate

limitations in understanding and memory, concentration, persistence and pace, social interaction

and ability to tolerate work stresses."  (R. 35).  In light of those findings, the ALJ found that

claimant was unable to perform her past relevant work and had no transferable skills.  (R. 35).

He further found that, considering the claimant's age, education, work experience, and RFC, she

was able to perform light duty jobs such as an information clerk, garment ticketer, and airline

security representative, which, based on VE testimony, existed in significant numbers in the

national economy that the claimant could perform. (R. 35).

The ALJ acknowledged considering the reports of state agency medical consultants and

non-examining medical sources (Psychiatric Review Technique Form prepared by a department psychologist; two Residual Capacity Tests filled out by nonexamining department physicians) that determined claimant could perform medium work activities and that claimant's mental impairments were nonsevere. (Ra. 33). While stating that these opinions were reasonable based on the evidence presented to them, the ALJ noted that additional evidence, including claimant's partially credible testimony at the hearing, supported a "more restricted range of work." Accordingly, the ALJ only gave "limited" weight to those agency determinations.

The ALJ also gave only "limited" weight to the findings of Dr. Gandhi, a consultant internist, who found that claimant suffered from severe COPD. Finding that Dr. Grandhi's conclusions were inconsistent with other consultative pulmonary tests performed in the summer of 2000 that showed improved breathing with bronchodilators, the ALJ placed great weight instead on those pulmonary tests. (R. 33-34.)

The ALJ gave only limited weight to the opinion of Dr. Cromeans, a consulting physician and partner of claimant's treating physician, Dr. Islam. Noting that Dr. Cromeans only completed an evaluation when Dr. Islam was on vacation, the ALJ preferred Dr. Islam's opinions. (R. 34).

In determining what weight to assign the opinion of Dr. Islam, the ALJ acknowledged that he was claimant's treating physician but nevertheless stated that he was not according controlling weight to his determinations. (R. 34). The ALJ went on to state that "Dr. Islam's findings are not consistent with the other substantive evidence of record, with the claimant's positive response to treatment, or with his own treatment notes and the evidence of noncompliance." (R. 34). Finally, the ALJ noted that "Dr. Islam has clearly indicated that he has

17

completed the medical source opinion form based primarily on the claimant's subjective complaints." (R. 34). As a result, the ALJ decided to "prefer" the findings and opinions of Dr. Hibbett, who, as mentioned above, rendered a nonexamining expert medical opinion on behalf of the Administration. The ALJ stated that Dr. Hibbett's opinion was consistent with the other substantive evidence of record and it was based upon a thorough review of all the objective medical evidence received into the record. (R. 34).

The ALJ did not specify what weight he accorded the opinion of Dr. Ashmore, one of claimant's treating physicians.

The ALJ concluded "that the claimant retained the capacity for work that exists in significant numbers in the national economy and is not under a 'disability' as defined by the Social Security Act . . . ." (R. 34).

The Appeals Council denied the request to review this decision.

## VI.  DISCUSSION

Claimant has already succeeded in obtaining an administrative finding that she was disabled as of June 3, 2004.  At issue before this court is her first claim for disability allegedly commencing five years earlier, on June 28, 1999.  This court must determine whether the ALJ applied the proper standards and whether substantial evidence supports the Commissioner's finding that she was not disabled as of that earlier date. Claimant argues that the ALJ erred in improperly placing controlling weight on the opinion of Dr. Lester Hibbett, a nonexamining physician, and according less weight to claimant's treating and consulting physicians.  The Commissioner acknowledges that the ALJ assigned greater weight to Dr. Hibbett's opinion but argues that the ALJ's determination was proper because the record was consistent with Dr.

Hibbett's findings but did not support those of the treating physicians.

In this circuit, the ALJ must accord "substantial weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the claimant's treating physician *unless* good cause exists for not doing so.  *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).  The Commissioner, as reflected in his regulations, also demonstrates a similar preference for the opinion of treating physicians:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalization.

*Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ "must specify what weight is given to the treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

An ALJ may discount even a treating physician's report when it is not accompanied by objective medical evidence. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  The required "good cause" for discounting a treating physician's opinion may exist where the opinion is not supported by the evidence, or where the evidence supports a contrary finding. *See Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence.  *See Jones v. Dept. of Health & Human Servs.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991); *Edwards*, 937 F.2d at 584-85; *Johns v. Bowen*, 821 F.2d 551, 555

(11th Cir. 1987).  However, the report of a nonexamining physician, taken alone, cannot provide such "good cause" if it is contrary to the treating physician's opinion; treating physician opinions are generally entitled to receive more weight than the findings of doctors who have not examined the claimant.  *Broughton*, 776 F.2d at 961 (finding that the ALJ committed error when he accorded more weight to the nonexamining doctor than to claimant's two examining physicians).

In the instant case, claimant's two treating physicians found that claimant was unable to work. One of her treating physicians, Dr. Ashmore, found that she was unable to work upon discharge from the hospital in July of 1999, shortly after her pulmonary embolism and a few days after she applied for disability benefits.  Although the ALJ mentioned this finding and noted subsequent tests that arguably reflect improvement in claimant's condition, the ALJ did not specify what weight he gave to Dr. Ashmore's opinion nor did he *explicitly* discount it.  This failure is particularly troublesome in light of the Appeals Council's concern that the first hearing decision did not "specify the degree of weight, of Dr. James D. Ashmore's opinion regarding the claimant's inability to work as of the July 12, 1999 report" and the Council's express direction on remand "to explain the weight given to such opinion evidence."  (R. 85-86).  "Where the Secretary has ignored or failed properly to refute a treating physician's testimony, [the Eleventh Circuit holds] as a matter of law that he has accepted it as true."  MacGregor, 786 F.2d at 1053 (finding that the Secretary accepted treating physician's opinion as true when he made no finding about the weight of the doctor's testimony and did not discredit it).  Accordingly, the Commissioner's failure to specify the weight he gave to claimant's treating physician and the reason for according that weight, is reversible error.  *See MacGregor*, 786 F.2d at 1053; *Broughton*, 776 F.2d at 961-62.

20

**VII.  CONCLUSION**

Claimant raises other alleged errors, but having found one reversible error, the court need not address the others.  Accordingly, for the reasons stated in this memorandum opinion, the court REVERSES and REMANDS this case to the Commissioner for further action consistent with this opinion.

Dated this 9th day of March, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE